IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | MEMORANDUM DECISION |
| Plaintiff, | : | AND ORDER DENYING |
| vs. | : | DEFENDANT'S MOTION |
| | : | TO SUPPRESS |
| | : | |
| FAUSTO MELENDREZ, JR., | : | |
| | : | Case No. 2:04 CR 00790 W |
| Defendant. | : | |

This matter is before the court on Defendant's Motion to Suppress. On January 31, 2005, the court conducted an evidentiary hearing on the motion. Defendant Fausto Melendrez, Jr. ("Fausto") was present with his counsel, Todd Utzinger. The government was represented by Vernon Stejskal. Following the hearing, the court ordered a transcript as well as supplemental briefing from the parties. Thereafter, at defendant's request, on May 4, 2005, the court heard oral argument on the matter. After thorough review and consideration of the pleadings submitted by the parties, the testimony presented at the evidentiary hearing on the motion to suppress, and the argument of counsel, the court enters the following memorandum decision and order.

## BACKGROUND

The court finds the relevant facts as follows.[1] Officer Marcelo Rapela is a police officer

---

[1] Reference to the transcript of the evidentiary hearing conducted on January 31, 2005, will be cited as "Tr. at ___."

1

with the West Valley Police Department, assigned to the DEA Metro Narcotics Task Force. (Tr. at 5.) Officer Rapela has extensive training and experience in drug investigations and drug interdictions. (Tr. at 6-7.) In 2004, the DEA Metro Narcotics Task Force was investigating a methamphetamine distribution ring operating in Salt Lake City, Utah. As part of the investigation, the task force initiated a Title III wiretap. Through monitored telephone calls, officers came to believe that a person named Alberto Melendrez ("Alberto") was supplying methamphetamine to the organization. (Tr. at 8.) On November 2, 2004, DEA officers arrested one of the targets of the wiretap, Sylvia Uribe. Following her arrest, Ms. Uribe agreed to work with law enforcement officers. Under the guidance of the task force, Ms. Uribe contacted Alberto by phone and arranged to purchase approximately four ounces of methamphetamine from him. (Tr. at 9.) A time and location for the purchase was agreed upon, and agents set up surveillance of the location in anticipation of Alberto's arrival. Alberto arrived at the prearranged location consistent with the arrangements made by Ms. Uribe. Alberto was driving a Nissan Altima, and the defendant Fausto Melendrez was seated in the front passenger seat. (Tr. at 10.) Alberto and Fausto Melendrez were both taken into custody, searched and questioned. (Tr. at 10-11.)

When officers searched Alberto they found four ounces of methamphetamine in his pocket. Alberto initially admitted the methamphetamine was his, but claimed he was not a "user." Alberto further claimed that he did not intend to sell the methamphetamine. Officer Rapela asked Alberto what he planned on doing with the methamphetamine if he was neither a user nor a seller. Alberto provided no explanation. (Tr. at 11-12.)

A set of keys with a "Shadow Ridge" tag were also located on Alberto. Officer Rapela

believed at the time of Alberto's arrest that "Shadow Ridge" referred to an apartment complex, but he was unaware of its location. (Tr. at 12.) Officer Rapela asked Alberto for his current address. Alberto "outwardly refused" to provide an address. Alberto's refusal to provide an address caused Officer Rapela to suspect that Alberto might be hiding additional methamphetamine at that location. (Tr. at 11-12.)

Officer Rapela also questioned Fausto on November 2, 2004. Fausto said that he had recently moved to Utah from Compton, California and was living in an apartment with his uncle, Alberto. When asked for the specific address, Fausto said that he could not remember. When asked for directions, Fausto was "vague." (Tr. at 13.) However, Fausto did indicate that the apartment was "off of 7200 South on the east side of town." (Tr. at 13.) Officer Rapela asked Fausto how he was going to get back to his apartment if he could not explain how to get there and did not know where it was located. Fausto responded, "he wasn't certain. He was going to try and find his way." (Tr. at 16.)   Officer Rapela testified that Fausto's claim that he was not sure of the apartment's location "indicated to me that they were trying to hide or secret that location, and there was a significant reason for that, and my suspicions were, that there were additional narcotics, methamphetamine specifically, being stored at that particular apartment." (Tr. at 15-16.)

Fausto told Officer Rapela that he and Alberto had come directly from the apartment to the prearranged location where he and his uncle were arrested. When asked specifically if they made any stops during the route from the apartment to the prearranged location. Fausto said "no." (Tr. at 13-14.) Officer Rapela testified that this continued to raise suspicions that there was a very good possibility that this apartment was a "stash house" for additional

3

methamphetamine. (Tr. at 14.)

Officer Rapela asked Fausto if he knew if there was additional methamphetamine in the apartment and Fausto responded, "I don't know." Officer Rapela testified that, based on his training and experience, he found Fausto's answer significant. According to Officer Rapela, "on traffic stops and at certain locations, when I receive the answer 'I don't know,' anywhere in upwards of 90 to 95 percent of the time I have discovered narcotics at that location or vehicle." (Tr. at 14-15.) Officer Rapela explained, "when they answer 'I don't know,' it's a way of basically trying to not acknowledge the fact that the narcotics are there or to take accountability for them, but not wanting to lie at the same time." (Tr. at 15.) Officer Rapela testified that Fausto's response suggested to him a "very strong possibility that there was indeed narcotics at that location where they had just come from." (Tr. at 15.)

Alberto was arrested and transported to the county jail. Officer Rapela testified that they did not believe they had sufficient probable cause to charge Fausto on that date. (Tr. at 16.) Accordingly, Fausto was released and transported back to where the Nissan Altima that Alberto had been driving was parked. The Nissan Altima was released to Fausto. (Tr. at 16.)

Because officers suspected that Alberto and Fausto came to the drug deal from a "stash house," the officers continued their efforts to locate Alberto and Fausto's apartment. The officers planned to apply for a search warrant once the apartment was located. (Tr. at 17.)

During the following week, law enforcement was aware that Fausto and Alberto remained in contact. On November 8, 2004, one of the task force officers observed Fausto and another person visiting Alberto at the county jail. Officer Rapela was made aware of this contact and believed that it suggested the possibility that they were speaking "in regards to this ongoing

4

criminal enterprise, the distribution of methamphetamine." (Tr. at 18.)

Several days after Alberto's arrest, Officer Rapela confirmed that there was an apartment complex known as "Shadow Ridge Apartments." The apartment complex was located as 1289 East Ridge Meadow Lane (7180 South). Upon contacting the real estate company for the complex, Officer Rapela was able to identify the specific apartment of Alberto and Fausto. (Tr. at 19.)

On November 10, 2004, Officer Rapela located the specific apartment at Shadow Ridge. Upon arriving at the apartment complex, Officer Rapela observed the Nissan Altima that had been used in the November 2, 2004 drug deal, parked in the parking stall assigned to Fausto and Alberto's apartment. (Tr. at 19.) Officer Rapela determined that a search warrant and affidavit should be written and that surveillance should be established on the apartment. Officer Rapela, who was accompanied by Special Agent Avalos, situated his vehicle so that they could maintain visual surveillance on the door of the apartment. Officer Rapela then began to prepare an affidavit for a search warrant on the computer located inside his car. Officer Rapela communicated with Special Assistant United States Attorney Colleen Coeghbergh about what he had observed, and she indicated that he should prepare an affidavit and a search warrant and submit it to a judge for signature. (Tr. at 20.)

While Officer Rapela was preparing the affidavit and warrant, he observed Fausto exit the target apartment. (Tr. at 21.) As Fausto walked to the Nissan Altima he looked at or in the direction of Officer Rapela's Jeep. (Tr. at 22-23.) Officer Rapela knew that Fausto was familiar with his Jeep as Officer Rapela's Jeep was present and within ten yards of the Nissan Altima on November 2, 2004 when Alberto was arrested and Fausto was questioned. (Tr. at 22.) Fausto

entered the driver's side of the Nissan Altima and then began using his cellular phone. (Tr. at 23.) Fausto remained in the parking stall and talked on the cellular phone for approximately 60 seconds. Officer Rapela began to worry that Fausto had recognized his Jeep and was using his phone to have any evidence inside the apartment hidden or destroyed. (Tr. at 23.) As Fausto started to leave the parking lot he looked, once again, at Officer Rapela's Jeep. Officer Rapela became increasingly concerned that Fausto had recognized him and detected his surveillance. (Tr. at 24.)

Officer Rapela decided to initiate a traffic stop on Fausto before Fausto left the apartment complex. (Tr. at 24.) Officer Rapela testified that he intended to make the vehicle stop in that area so that he could continue to observe the apartment. (Tr. at 25.) Officer Rapela testified that "if [Fausto] had indeed made a phone call inside, I wanted to not be able to let them see us during the course of the traffic stop and I wanted to be close enough that we could still keep a relatively close eye on this apartment until [an additional agent] arrived to be able to establish additional surveillance on the front door of this apartment." (Tr. at 25.) Officer Rapela was concerned that if a traffic stop was not made within a reasonable distance from the apartment door, there was a possibility that any additional narcotics inside the apartment could leave with another person or be destroyed inside. (Tr. at 26.) Officer Rapela did not observe any traffic violations prior to the stop. (Tr. at 25.)

Officer Rapela testified that at the time of the stop, based on the information they had gathered through their investigation, they had determined that this apartment was likely the place of origin for the methamphetamine found on November 2, 2004. Based on that, they determined a search warrant should be executed at the residence to determine if there was additional

methamphetamine at that location. (Tr. at 26.) In addition, Officer Rapela testified that they believed Fausto was a key player in this investigation and, more likely than not, was involved in the secreting or hiding of methamphetamine in the apartment, especially now that his uncle, Alberto, was in jail. Officer Rapela testified that the purpose of the stop was to investigate that further and to speak with Fausto about the possibility of any methamphetamine being at that location, and whether this was indeed his apartment. (Tr. at 26.)

Officer Rapela stopped Fausto's vehicle by pulling up behind him and activating his emergency lights. Fausto complied by pulling the car into an uncovered parking stall and waiting for Officer Rapela to approach. Officer Rapela exited his Jeep, displayed his badge and walked up to the driver's side window. Fausto rolled down his window. Officer Rapela greeted Fausto and Fausto responded, "I thought that was you." (Tr. at 24, 30.) According to Officer Rapela, the conversation between Officer Rapela and Fausto was "a very friendly interaction." (Tr. at 32.) There was no display of force or coercion. (Tr. at 31-32.) Fausto was "quite congenial and cooperative." (Tr. at 32.) Officer Rapela described the conversation as "very affable." (Tr. at 32.)

Officer Rapela asked Fausto if the apartment he just exited was the same apartment he and Alberto had been in on the day Alberto was arrested. Fausto confirmed it was. (Tr. at 31.) Officer Rapela asked Fausto about possible drug activity and explained that he thought Alberto was storing drugs in the apartment. Rapela specifically asked Fausto whether there was any methamphetamine in the apartment. Fausto replied, "no." (Tr. at 31.) Officer Rapela then asked Fausto if he would sign a consent form allowing him to search the apartment, and Fausto said he would. (Tr. at 31.)

Officer Rapela asked Fausto if he would step out of the car to sign the consent form. (Tr. at 31.) As Fausto got out of the car, Officer Rapela asked him if there was any methamphetamine or narcotics in the car. Fausto indicated there was not. Officer Rapela then asked Fausto if he had any methamphetamine or narcotics on his person, and Fausto again replied, "no." (Tr. at 31.) Officer Rapela asked Fausto for permission to search his pockets. Fausto agreed. (Tr. at 31.) During the search, Officer Rapela found four baggies in a coat pocket. Each baggy contained approximately one ounce of methamphetamine. Officer Rapela placed Fausto under arrest. (Tr. at 32.)

At the time Officer Rapela stopped Fausto, he had not completed the affidavit or search warrant, and the search warrant had not been submitted to a judge for approval. Following the traffic stop, Officer Rapela added information he obtained during the course of and as a result of the traffic stop.[2] The warrant was later approved.

Defendant Fausto claims that Officer Rapela lacked a reasonable suspicion of criminal activity necessary to justify the stop of his vehicle, rendering the stop and detention unconstitutional. Defendant further asserts that because the stop was unconstitutional, his subsequent consent to search was also unconstitutional because it was tainted by the police misconduct. Accordingly, Fausto asserts that all evidence seized on November 10, 2004 must be suppressed as fruit of the poisonous tree.

---

[2]Officer Rapela identified the additional information that would not have been in the affidavit at the time of the traffic stop. Officer Rapela indicated that last full paragraph on page 4 and the small paragraph on the top of page 5 were added to the affidavit following the stop. (Tr. at 28-29.)

## DISCUSSION

The Fourth Amendment requires that all "searches and seizures" be based on probable cause. There are, however, certain narrowly drawn exceptions to the probable cause requirement, including the investigatory detention, or Terry stop. United States v. Sharpe, 470 U.S. 675, 689 (1985) (Marshall, J., concurring).

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry, 392 U.S. at 22. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response." Adams v. Williams, 407 U.S. 143, 145 (1972). "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Adams, 407 U.S. at 146.

The court considers the reasonableness of an investigative detention under the two-part inquiry set forth in Terry v. Ohio, 392 U.S. 1, 19-20 (1968). First, the court must determine whether the officer was justified in detaining the defendant at the inception. If so, the court next determines whether the officer's actions during the detention were reasonably related in scope to the circumstances which justified the initial detention. An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the detention, and the

scope of the detention must be carefully tailored to its underlying justification. United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997). In this case, defendant does not challenge the officer's actions during the detention or the scope of the detention. Rather, the defendant challenges only the reasonableness of the initial detention itself. Accordingly, the court turns to that inquiry.

A detention is justified at its inception only if law enforcement officials are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the detained individual may be engaged in criminal activity. United States v. Gutierrez-Daniez, 131 F.3d 939, 942 (10th Cir. 1997). The law does not specify a minimum number of factors necessary to constitute reasonable suspicion. United States v. Lopez-Martin, 25 F.3d 1481, 1484 (10th Cir. 1994). In United States v. Cortez, 449 U.S. 411 (1981), the Supreme Court stated:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad of factual situations that arise. But the essence of all that has been written is that the totality of the circumstances–the whole picture–must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

Id. at 417. When making this evaluation, a court must not engage in a "divide and conquer" analysis. See United States v. Arvizu, 534 U.S. 266, 274 (2002). That is, a court must not separate out each factor and reject the officer's determination of reasonable suspicion simply because each factor, standing alone, might be "readily susceptible of an innocent explanation." United States v. Gandara-Salinas, 327 F.3d 1127, 1130 (10th Cir. 2003). "A proper examination of the totality of the circumstances must recognize that '[i]ndividual factors that may appear

10

innocent in isolation may constitute suspicious behavior when aggregated together.'" United States v. Quintana-Garcia, 343 F.3d 1266, 1270-71 (10th Cir. 2003) (quoting United States v. Diaz-Juarez, 299 F.3d 1138, 1141 (9th Cir. 2002)); see also United States v. Sokolow, 490 U.S. 1, 9-10 (1989) (providing that conduct that may be wholly innocent may nonetheless support a finding of reasonable suspicion in certain circumstances).

Finally, the evaluation must be made from the perspective of the reasonable *officer*, not the reasonable *person*. Officers must be permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Cortez, 449 U.S. at 418).

With the foregoing principles in mind, the court turns to the facts of this case. The defendant contends that Officer Rapela lacked any objective justification for the stop and detention on November 10, 2004. Specifically, defendant Fausto argues that the detention was based on nothing more than "guilt by association" and claims that it was unlawful for Officer Rapela to detain him merely because he was related to some other person who was engaged in criminal activity. (Def's Br. At 14.)

Certainly, officers may not stop an individual merely because he is in the company of a suspected criminal. The justification for a Terry stop and frisk must be particularized with respect to that particular person. Ybarra v. Illinois, 444 U.S. 85, 91 (1979). Nonetheless, numerous courts have recognized, however, that knowledge of certain associations, such as gang affiliations, may be a component of the required articulable suspicion. See Ornelas v. United States, 517 U.S. 690, 696 (1996) (this Court does not dispute that such knowledge may be a

11

component of the required articulable suspicion, but it must be accompanied by something more to ensure that an officer has a "particularized and objective basis" for suspicion); United States v. Feliciano, 45 F.3d 1070, 1074 (7th Cir.) (providing that gang affiliations, "while of doubtful *evidentiary* value in view of the strictures against proving guilt by association . . . are a permissible component of the articulable suspicion required for a Terry stop."), cert. denied, 516 U.S. 853 (1995); United States v. Amoroso, 257 F. Supp. 2d 310, 319 n.9 (D. Maine 2003) ("This court does not dispute that such knowledge (of gang affiliation) may be a *component* of the required articulable suspicion, but it must be accompanied by something more to ensure that an officer has a "particularized and objective basis" for suspicion."); see also United States v. White, 47 F.3d 1174 (7th Cir. 1995) (providing that even though the suspected gang membership was not linked to any specific criminal activity, the membership alone provided some support for the officer's suspicion, although it has less weight than it otherwise might in evaluating the totality of the circumstances).

      Moreover, in addition to Fausto's mere relation to and association with Alberto, the *context* in which the officer's learned of Fausto's relationship with Alberto is highly significant. This is not a situation where the officers became familiar with Fausto after observing Fausto and Alberto participating in innocent conduct, i.e., bowling or grocery shopping. Rather, the officers became aware of Fausto and his relationship with Alberto after observing Fausto and Alberto during the course of a drug deal. See United States v. Watson, 1995 WL 151869 (N.D. Ill. 1995) (providing that "reasonable suspicion may be based in part on observing an individual with known drug dealers when they are in the course of apparent illegal activity").

      Thereafter, when the officers questioned Fausto, they learned that not only did Fausto

accompany Alberto to the drug deal, but also that Fausto was residing with Alberto, and that Fausto and Alberto had traveled directly from their shared apartment to the designated location for the drug transaction.

When the officers asked Fausto questions about the apartment's location and contents, Fausto gave answers that Officer Rapela perceived to be evasive. With regard to the location of the apartment, Fausto said that although he lived there, he did not know the address. When asked to explain how to get there, Fausto was "vague." (Tr. at 13.) When asked how he was going to get home, Fausto said "he was going to try and find his way." (Tr. at 16.) Given these responses, Officer Rapela could reasonably have believed that Fausto was being evasive which caused Officer Rapela to be suspicious.[3] Similarly, when asked if the apartment had drugs inside, Fausto responded, "I don't' know" as opposed to "no." Officer Rapela testified that given his background and training, Fausto's response suggested to him an attempt to be evasive and avoid accountability. (Tr. at 14-15.) In addition, Officer Rapela was aware that Fausto and Albert remained in contact during the course of Alberto's incarceration.

Finally, upon locating Fausto and Alberto's apartment, and while drafting a search warrant, Officer Rapela observed Fausto exit the target apartment. It appeared to Officer Rapela that as Fausto walked toward the Nissan Altima Fausto recognized him, especially since he was in the same Jeep that he had used when he confronted Alberto and Fausto on November 2.

---

[3] Whether Fausto did not, in fact, know the address of the apartment is irrelevant for purposes of the present motion. Similarly, that Fausto identified the general location for the apartment, which ultimately turned out to be correct, is not highly significant. For purposes of this motion, the proper inquiry is what the officer reasonably perceived given Fausto's answers. Given the context of the conversation, and based on Officer Rapela's testimony, the court concludes that Officer Rapela could reasonably have believed that Fausto was attempting be evasive in his answers to police questioning.

13

Legitimately concerned that he had been recognized, Officer Rapela feared that drugs could be secreted or destroyed if Fausto was able to communicate to others that the apartment was being watched by officers. Fausto's use of his cell phone after appearing to recognize Officer Rapela served to heighten Officer Rapela's concerns. Based on these factors, Officer Rapela made a decision to stop the vehicle at a location within the apartment complex.

The court is mindful that when considered separately any one of the facts known to Officer Rapela is not proof of any illegal conduct on the part of defendant Fausto. Nonetheless, the court is of the opinion that these facts, when viewed in the context of the "whole picture" and taken together with Officer Rapela's training and experience, made Officer Rapela's suspicion that Fausto was engaged in criminal activity reasonable, thus justifying Fausto's brief detention.

Therefore, based on the foregoing and good cause appearing, IT IS HEREBY ORDERED that defendant's motion to suppress is DENIED.

DATED this 25th day of May, 2005

BY THE COURT:

David K. Winder
Senior District Court Judge